IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-cv-772 |
| | ) | |
| NAUTILUS INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff, Westfield Insurance Company ("Westfield"), brings this action against Nautilus Insurance Company ("Nautilus"), alleging that Nautilus breached its duty to defend and indemnify Westfield's insured, J. Wayne Poole, Inc. ("Poole"), in an underlying state court action. Before the Court are Westfield's Motion for Judgment on the Pleadings, (ECF No. 17), and Nautilus's Motion for Summary Judgment, (ECF No. 21). For the reasons that follow, the Court grants Nautilus's motion in part, to the extent it seeks judgment on its duty to defend, and denies Westfield's motion.

## I.     BACKGROUND

On or about February 7, 2012, Poole contracted with the Guilford County Board of Education to serve as the general contractor for a project involving renovations to the roof of Alamance Elementary School. (ECF No. 1 ¶ 12.) Poole then entered into a subcontractor agreement with Associated Steel Crane & Rigging, LLC ("Associated Steel"), whereby Associated Steel was to install structural steel and steel decking at the school. (*Id.* ¶ 13; ECF No. 1-4 § 2.) As part of the subcontract, Associated Steel was to obtain

commercial general liability insurance and name Poole as an additional insured on the policy. (ECF No. 1-4 § 7.1.) Associated Steel secured a commercial general liability insurance policy from Nautilus, (ECF No. 1-2), that included an endorsement naming as an additional insured any entity that Associated Steel agreed to name as an additional insured. (ECF No. 1-3.) The endorsement provided coverage for the additional insured only with respect to liability for property damage caused in whole or in part by Associated Steel in connection with Associated Steel's ongoing operations for the additional insured. (*Id.*)

On July 20, 2012, a rain event led to water entering the interior of the school and causing damage. (ECF No. 1 ¶¶ 17–18.)[1] Poole contracted with Southeast Restoration, Inc., d/b/a Afterdisaster to perform remediation of the school's interior. (*Id.* ¶ 19.) On August 23, 2012, Afterdisaster billed Poole $258,437.25 for its work at the school. (*Id.* ¶ 20; ECF No. 1-5.) Poole then made a claim to Westfield for the costs of Afterdisaster's services to remediate the school due to the water intrusion. (ECF No. 1 ¶ 21.)

On December 3, 2012, Afterdisaster filed a lawsuit against Poole in state court because the bill for Afterdisaster's services had not been paid. (*Id.*; ECF No. 1-6 ¶ 11.) In the lawsuit, Afterdisaster asserted that Poole had failed to pay $258,437.25, the amount of Afterdisaster's services to remediate the school. (ECF No. 1-6 ¶ 11.) Westfield provided a defense for Poole in that lawsuit under a full reservation of rights. (ECF No. 1 ¶ 22.) On February 28, 2013, Poole filed a third-party complaint against Associated Steel in the state

---

[1] During the course of work on the Alamance Elementary School project, Poole and its subcontractors, including Associated Steel, used tarps and other material to protect the school's premises from weather events. (*See* ECF No. 1 ¶¶ 15–16; ECF No. 1-7 ¶¶ 13–14; ECF No. 1-8 ¶¶ 13–14.)

court lawsuit. (*Id.* ¶ 23; ECF No. 1-7.) In the third-party complaint, Poole claimed that Associated Steel breached the subcontractor agreement by failing to protect the school's premises from the water intrusion. (ECF No. 1-7 ¶ 34.) Poole further claimed that Associated Steel agreed to indemnify Poole for "any damages, losses, or expenses arising out of or resulting from [Associated Steel's] work on the Project." (*Id.* ¶ 41.) Nautilus provided a defense for Associated Steel against Poole's claims. (ECF No. 1 ¶ 25.)

On May 17, 2013, Poole tendered a demand to Nautilus for defense and indemnity based on the claim asserted by Afterdisaster. (*Id.* ¶ 26; ECF No. 1-9.) Nautilus responded that although Poole was an additional insured under Associated Steel's policy, there was no coverage for Afterdisaster's claim against Poole. (ECF No. 1 ¶¶ 28–30; ECF No. 1-10 at 4.) Specifically, Nautilus stated:

> The Complaint alleges that your client refused to pay a debt and the Plaintiff is seeking to recover the value of the services contracted for by your client. Unfortunately the allegations in the Complaint do not allege an "occurrence" resulting in "property damage" to trigger coverage as an additional insured on our policy.

(ECF No. 1-10 at 4.)

In July 2013, Poole entered into a settlement agreement with Afterdisaster, and Westfield paid the entire settlement amount of $268,000. (ECF No. 1 ¶¶ 32–33.) Poole also dismissed its third-party suit against Associated Steel. (*Id.* ¶ 32.) Following resolution of the state court action, Poole assigned to Westfield all of its rights to pursue coverage under the Nautilus policy for the damages arising out of the July 2012 incident at Alamance Elementary School. (*Id.* ¶ 35.)

On September 9, 2014, Westfield filed this action against Nautilus to recover the amounts it paid in defending and settling the state court action between Poole and Afterdisaster. Westfield asserts four causes of action: (1) that Westfield is entitled to a declaratory judgment that Nautilus had a duty to defend Poole in the state action; (2) that Nautilus breached its contractual obligations under the Nautilus policy by not providing a defense and indemnifying Poole in the state action; (3) that Westfield is entitled to subrogation against Nautilus to recover amounts incurred in investigating, defending, and resolving the claims arising out of the water intrusion event; and (4) that Westfield is entitled to equitable subrogation against Nautilus to recover the amounts it incurred in resolving the water intrusion event. (*See* ECF No. 1 at 8–12.)

## II. PENDING MOTIONS

On March 16, 2015, Westfield moved, pursuant to Rule 12(c), for judgment on the pleadings as a matter of law, requesting a declaration that Nautilus breached its duty to defend Poole in the underlying state action. (ECF No. 17.) Nautilus then moved for summary judgment under Rule 56, asserting that it had no duty to defend Poole in the underlying state action and further that it is entitled to summary judgment on all claims brought by Westfield. (ECF No. 21.) The parties' briefings reference a number of documents attached to the complaint, and Nautilus has attached the notices of dismissal in the state court action to its briefing. Ordinarily, before a court exercises its discretion to convert a motion under Rule 12(c) into one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, Nautilus and Westfield agree that the duty to defend issue is

ripe for review and needs no further factual development to resolve. (*See* ECF No. 27 at 2 n.1.) This Court, therefore, converts Westfield's motion into one for summary judgment, thus treating the parties' motions as cross-motions for summary judgment. *See Sea-Land Serv., Inc. v. United States,* 622 F. Supp. 769, 771–72 (D.N.J. 1985) (converting the motion to dismiss into one for summary judgment, thereby "treat[ing] the motions . . . as cross-motions for summary judgment because they raise the identical legal issue, and the parties appear to agree that no material facts are in dispute").

## III.  LEGAL STANDARD

"Summary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). Where, as in this case, the court has before it cross-motions for summary judgment, the court reviews each of them separately to determine if either party is entitled to judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## IV.  DISCUSSION

The Court has subject matter jurisdiction in this action based on diversity of citizenship and therefore looks to North Carolina's choice of law principles to determine which state's substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496–97 (1941). Under North Carolina law, where the parties' dispute involves an insurance policy, the state in which the policy was issued governs the dispute. *See Roomy v. Allstate Ins. Co.*, 256 N.C. 318, 322, 123 S.E.2d 817, 820 (1962). The Nautilus policy was issued in North

5

Carolina to its insured, Associated Steel, (ECF No. 1-2 at 3), and thus, the Court must interpret the policy according to North Carolina law.

### A. Overview of North Carolina Insurance Law

In North Carolina, an insurance policy is a contract, and its terms govern the parties' rights and duties. *Fidelity Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986). Courts are to construe the policy's provisions with the goal of determining the parties' intent at the time the policy was issued. *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505, 246 S.E.2d 773, 777 (1978). The party seeking benefits under the policy bears the burden of demonstrating coverage. *Fortune Ins. Co. v. Owens*, 351 N.C. 424, 430, 526 S.E.2d 463, 467 (2000). Interpretation of an insurance policy is a question of law for the court. *Allstate Ins. Co. v. Runyon Chatterton*, 135 N.C. App. 92, 94, 518 S.E.2d 814, 816 (1999).

The North Carolina Supreme Court has held that an insurer's duty to defend is broader than, and is independent from, its duty to indemnify. *See Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 691, 340 S.E.2d 374, 377 (1986). The duty to defend is generally determined by analyzing the pleadings in the underlying lawsuit. *Id.* To determine whether circumstances give rise to a duty to defend, courts employ the "comparison test;" "the pleadings are read side-by-side with the policy" to determine whether there is coverage for the events alleged in the complaint. *Id.* at 693, 340 S.E.2d at 378. When the terms of the policy cover the events in the pleadings, the insurer has a duty to defend, irrespective of the outcome of the case. *Erie Ins. Exch. v. Builders Mut. Ins. Co.*, 227 N.C. App. 238, 245, 742 S.E.2d 803, 810 (2013). An insurer's obligation, however, does not end with a review of the pleadings and applicable policy. *See id.* "Where the insurer knows or could reasonably

ascertain facts that, if proven, would be covered by its policy," the duty to defend is triggered. *Waste Mgmt. of Carolinas, Inc.*, 315 N.C. at 691–92, 340 S.E.2d at 377. This is true even if the alleged facts appear to be outside coverage or within a policy exclusion. *Erie Ins. Exch.*, 227 N.C. App. at 245, 742 S.E.2d at 810. The mere possibility that the claim is covered "suffice[s] to impose a duty to defend upon the insurer." *Waste Mgmt. of Carolinas, Inc.*, 315 N.C. at 691 n.2, 340 S.E.2d at 377 n.2. An insurer that unjustifiably refuses to provide a defense to its insured faces severe consequences; it is liable for the amount and costs of a reasonable settlement entered into by the insured. *Pulte Home Corp. v. Am. S. Ins. Co.*, 185 N.C. App. 162, 163–64, 647 S.E.2d 614, 616 (2007) ("[An insurer undertakes a substantial risk when it chooses not to provide a defense."). "[A]ny doubt as to coverage must be resolved in favor of the insured." *Duke Univ. v. St. Paul Fire & Marine Ins. Co.*, 96 N.C. App. 635, 637, 386 S.E.2d 762, 763–64 (1990).

Although the duty to defend is broad, it is not limitless; rather, its scope is measured by the insurance contract between the parties. *See Lambe Realty Inv., Inc. v. Allstate Ins. Co.*, 137 N.C. App. 1, 5, 527 S.E.2d 328, 331 (2000) (explaining that "an insurer's duty to defend an action brought against its insured is determined by the language in the policy"); *Brown v. Lumbermens Mut. Cas. Co.*, 90 N.C. App. 464, 475, 369 S.E.2d 367, 373 (1988) (noting that an insurer "could presumably contractually limit its duty to defend"). It is therefore the intention of the parties, as expressed by the terms of the policy, that is "the controlling guide" in interpreting the policy. *Hawley v. Indem. Ins. Co. of N. Am.*, 257 N.C. 381, 387, 126 S.E.2d 161, 167 (1962).

Unlike the duty to defend, the duty to indemnify "is measured by the facts ultimately determined at trial." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 6, 692 S.E.2d 605, 610 (2010) (quoting *Waste Mgmt. of Carolinas, Inc.*, 315 N.C. at 691, 340 S.E.2d at 377). Those adjudicated facts are then compared to the terms outlined in the insurance policy to determine whether there is coverage for the claim. *Id.* at 7, 692 S.E.2d at 611. "The difference in scope between the duty to defend and the duty to indemnify is based on the source of the factual narrative." *Id.* As explained by the North Carolina Supreme Court, "the duty to defend is broader than the duty to indemnify in the sense that an unsubstantiated allegation requires an insurer to defend against it so long as the allegation is of a covered injury." *Id.* at 7, 692 S.E.2d at 610–11.

## B. Whether Nautilus Had a Duty to Defend Poole

In employing the comparison test, *i.e.*, reading the pleadings side-by-side with the policy, the Court must first determine the scope of coverage under the Nautilus policy issued to Associated Steel. The Court starts with a review of the pertinent terms in the policy.

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
>
> . . . .

8

> b. This insurance applies to "bodily injury" and "property damage" only if:
>> (1) The "bodily injury" or "property damage"[2] is caused by an "occurrence"[3] . . . .

(ECF No. 1-2 at 10.)

The additional insured endorsement under the Nautilus policy provides in relevant part:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II-Who Is An Insured is amended** to include as an additional insured any person or organization when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury," "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions, or the acts or omissions of those acting on your behalf:

1. In the performance of your ongoing operations for the additional insured . . . .

(ECF No. 1-3 at 2.)

Based on the policy, Associated Steel, as the named insured, has coverage when there is an accident that causes damage to property other than the work product itself. Coverage

---

[2] North Carolina courts define "property damage" as "damage to property that was *previously undamaged* and *not* the expense of repairing property or completing a project that was not done correctly or according to contract in the first instance." *Builders Mut. Ins. Co. v. Mitchell*, 210 N.C. App. 657, 661–62, 709 S.E.2d 528, 532 (2011) (quoting *Prod. Sys., Inc. v. Amerisure Ins. Co.*, 167 N.C. App. 601, 606, 605 S.E.2d 663, 666 (2004)).

[3] Under the policy, "'[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (ECF No. 1-2 at 23.) The policy does not define the term "accident," but the North Carolina courts define "accident" as "an unforeseen event, occur[r]ing without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence." *Builders Mut. Ins. Co.*, 210 N.C. App. at 660, 709 S.E.2d at 531 (alteration in original) (quoting *Tayloe v. Hartford Accident & Indem. Co.*, 257 N.C. 626, 627, 127 S.E.2d 238, 239–40 (1962)).

for Poole as an additional insured under the Nautilus policy is triggered when there is property damage caused in whole or in part by some act or omission by Associated Steel. To determine whether the underlying state court action triggered Nautilus's duty to defend Poole as an additional insured, the Court turns to the allegations asserted by Afterdisaster in its complaint. In relevant part, those allegations are:

> 5. During the summer of 2012, Guilford BOE contracted with Poole to conduct repairs on the school, including its roof.
>
> 6. On or about July 20, 2012, a rain event led to significant water intrusion into the school. That same day, . . . Poole called Plaintiff to conduct emergency remediation of the water.
>
> 7. . . . Poole and Plaintiff executed a large-loss contract for the restoration, remediation and cleaning work of the building and the school's equipment.
>
> 8. Pursuant to the Contract, Plaintiff proceeded to perform the work necessary to protect and preserve the school. . . .
>
> 11. On or about August 23, 2012, Plaintiff invoiced Poole for its work in the amount of $258,437.25. Poole has failed and refused to pay this debt, therefore interest has accrued at 1.5% per month.

(ECF No. 1-6 ¶¶ 5–8, 11.)

Nautilus does not appear to dispute Westfield's argument that the July 20, 2012 rain event constituted an "occurrence" that caused at least some "property damage" at the school. (*See* ECF No. 29 at 5 n.3.) Rather, Nautilus argues that it owed no duty to defend Poole because Afterdisaster sued Poole in the state court action for breach of contract, and "[c]ontractual damages are not property damages." (ECF No. 22 at 7–8.) According to Nautilus, Afterdisaster's complaint "does not include allegations that describe accidental conduct" as defined under the policy. (*Id.* at 11.) Westfield, on the other hand, maintains that it is the nature of the underlying action, and not the label attached to the legal claims

asserted, that determines whether an insurer is obligated to defend a claim, (ECF No. 20 at 7), and such a determination is made if the claim is potentially covered under the Nautilus policy, (*see* ECF No. 18 at 1).

Although Westfield is correct that the label of a claim is not dispositive of an insurer's duty to defend, a general commercial liability policy traditionally has its origin in negligence or "draws on traditional tort concepts of fault, proximate cause and duty." *Anthem Elecs., Inc. v. Pac. Emp'rs Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002); *see Key Custom Homes, Inc. v. Mid-Continent Cas. Co.*, 450 F. Supp. 2d 1311, 1317 (M.D. Fla. 2006) ("General liability insurance 'is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss.'" (quoting *Harris Specialty Chems., Inc. v. U.S. Fire Ins. Co.*, No. 3:98-CV-351-J-20B, 2000 WL 34533982, *6 (M.D. Fla. Jul. 7, 2000))).  It is therefore relevant that the state court lawsuit did not involve either negligence or fault, particularly since coverage for Poole as an additional insured under the Nautilus policy depended on some alleged act or omission by Associated Steel.  As the Fourth Circuit noted, the purpose of the additional insured endorsement is to provide protection for the additional insured where the named insured is at least partially negligent.  *Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 788 F.3d 375, 380 (4th Cir. 2015).  Afterdisaster's state complaint did not mention Associated Steel, and there is no fact that would have been determined in the underlying state suit for breach of contract that would have arguably dealt with any act or omission on the part of Associated Steel.[4]  Contrary to Westfield's argument

---

[4] Poole's third-party complaint against Associated Steel does include allegations of culpable conduct on the part of Associated Steel.  (*See* ECF No. 1-7 ¶¶ 16–18.)  Although courts in North Carolina generally consider third-party complaints in determining coverage issues, some courts have declined

that the state court action stems from an "occurrence," *i.e.,* the water intrusion event, it was Poole's unilateral decision to contract with Afterdisaster for remediation services, and subsequently failing to pay for such services, which caused the state suit against Poole. Afterdisaster did not suffer property damage and therefore was not seeking damages because of property damage.   Rather, Afterdisaster is in the business of "providing emergency remediation and repair services due to water damage," (ECF No. 1-6 ¶ 1), and the damages it sought arose out of Poole's non-accidental failure to honor its contractual obligations, which are purely economic losses in nature.   That Poole was sued for such losses does not constitute "property damage" caused by an "occurrence" to trigger a duty to defend under the Nautilus policy.[5]  *See Holz-Her U.S., Inc. v. U.S. Fidelity & Guar. Co.,* 141 N.C. App. 127, 130, 539 S.E.2d 348, 351 (2000) (holding that the underlying lawsuit did not involve an "occurrence" under the policy because "refus[ing] to lease equipment to a newly-formed

---

to consider a third-party complaint brought by a putative additional insured to bolster its claim of coverage on the third-party defendant's insurance policy, *see, e.g., Dale Corp. v. Cumberland Mut. Fire Ins. Co.,* No. 09-1115, 2010 WL 4909600, at *8 (E.D. Pa. Nov. 30, 2010) (ruling that "the third party complaint cannot be used to bolster the allegations in the original complaint and thereby trigger . . . [the] duty to defend").  Moreover, under Rule 14(a) of the North Carolina Rules of Civil Procedure, it is unclear whether the third-party complaint would have been litigated in the state action in any event because it appears to be independent of Poole's liability to Afterdisaster.  *See Zizzo v. Pender Cty. Bd. of Educ.,* 175 N.C. App. 402, 404, 623 S.E.2d 328, 330 (2006) (explaining that a claim that is independent of the defendant/third-party plaintiff's liability to the plaintiff cannot form the basis of impleading a party under Rule 14).

[5] Perhaps the Court's analysis would have proceeded differently had Nautilus's denial of coverage caused the lawsuit to be filed against Poole.  Nor does it appear that Nautilus's refusal to defend Poole caused any prejudice to the defense of Poole by Westfield in any way.  Poole tendered the claim to Westfield before the state lawsuit was filed on December 3, 2012; Poole tendered the claim to Nautilus on May 17, 2013, more than five months after the lawsuit was filed and about ten months after the rain event; Nautilus denied coverage on June 4, 2013; and the case settled on July 19, 2013, just weeks after Nautilus denied coverage.  (ECF No. 1 ¶¶ 21, 26, 28, 32.)  As such, Nautilus's refusal to defend Poole neither caused the state action nor does it appear that it caused prejudice to the defense of Poole.

12

company after already allegedly agreeing to do so, even from the viewpoint of [the insured], was substantially certain to cause [plaintiff] delays and other consequential business injuries"); *see also ePlus Grp., Inc. v. Banc of Am. Leasing & Capital, LLC*, No. 05 Civ. 0190(RMB), 2006 WL 318863, at *4 (S.D.N.Y. Feb. 10, 2006) (explaining that defaulting on a contract is not a claim for property damage caused by an occurrence).

While each party has cited cases, none speaks directly to the issue presented here, and the Court finds no North Carolina authority that addresses the specific issues raised in this case. Although not binding, the Court finds several district court cases instructive. In *Key Custom Homes, Inc. v. Mid-Continent Casualty Co.*, the plaintiff, a general contractor and builder for a home construction project, was sued by the owners of the land on which the home was to be built and various subcontractors after an accidental fire totally destroyed the home. 450 F. Supp. 2d 1311, 1313–14 (M.D. Fla. 2006). The Hunt Family, who owned the land, brought suit for breach of contract against the general contractor to recover money it advanced to the general contractor for expenses associated with the project. *Id.* at 1313. Subcontractors also sought to recover money due to them for labor and material they provided on the project. *Id.* at 1313–14. The plaintiff general contractor made a claim under its general liability policy which, similar to the policy in this case, covered "those sums that the insured becomes legally obligated to pay as damages because of . . . property damage." *Id.* at 1314. The insurer denied coverage, explaining that the claims by the Hunt Family and the subcontractors were economic damages arising out of contracts entered into by the parties. *Id.* at 1315. The plaintiff then commenced an action, seeking a declaration that the insurance policy provided coverage for the claims asserted by the Hunt Family and the

subcontractors. *Id.* In its decision holding that the policy did not provide coverage for the claims in the underlying action, the court stated:

> Although the various claims against [the general contractor] may be traced, from [its] point of view, to the property damage to the [construction project] caused by fire, they are separate and independent claims which have their basis in either statute (the construction liens on the Hunt Family property) or common law (the breach of contract claims). In short, [the general contractor's] argument simply overlooks the fact that the claims against it would exist regardless of the loss of the property by fire. They do not have their basis in either tort law or seek recovery for damage to any tangible property. For example, the Hunt Family's state court complaint alleges a sole claim for breach of a written agreement with [the general contractor], and simply seeks recovery of the money it advanced to [the general contractor]-in other words, economic damages. The Hunt Family does not allege any tort-based claims, nor does it seek recovery for the destruction or loss of use of any tangible property.

*Id.* at 1318.

In *Woodcraft Manufacturing, Inc. v. Charter Oak Fire Insurance Co.*, a subcontractor was sued by a general contractor for the recovery of money the general contractor was held liable for with respect to a workers' compensation claim filed by an employee of the subcontractor. No. 3:08cv455/MCR/EMT, 2009 WL 1329138, at *1, *2 (N.D. Fla. May 12, 2009). Pursuant to its agreement with the general contractor, the subcontractor was required to obtain workers' compensation insurance for its work on the general contractor's project. *Id.* at *1. The subcontractor's employee was injured at the worksite and brought suit against his employer, the subcontractor, along with the general contractor. *See id.* at *1 & n.7. The subcontractor turned to its workers' compensation carrier for coverage, but the carrier denied coverage. *Id.* at *1. After judgment was entered against the subcontractor and general contractor, the general contractor brought suit seeking contribution and indemnification from the subcontractor and also asserting a claim for breach of contract due

to the subcontractor's failure to obtain the necessary workers' compensation coverage under the subcontract. *Id.* at *2. The subcontractor then made a claim under its commercial general liability policy for defense and indemnification, but the insurer denied coverage on the ground that the general contractor's lawsuit involved only economic claims against the subcontractor. *Id.* The subcontractor filed suit against the commercial liability insurer for breach of the insurer's duty to defend and indemnify it. *Id.* at *2. Similar to this case, the policy at issue stated that the insurer was to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'" and that the insurer would "have the right and duty to defend the insured against any 'suit' seeking those damages." *Id.* at *1. Based on the terms of the policy, the court stated that "[n]one of [the general contractor's] claims against [the subcontractor] . . . were based on bodily injury." *Id.* at *3. Although the employee's "physical injury formed the background for [the general contractor's] lawsuit, [the general contractor] did not sue [the subcontractor] because [the employee] was injured and did not seek damages for [that] injury." *Id.* The court stated that the general contractor brought suit against the subcontractor "because it was forced to pay the workers' compensation benefits [the subcontractor] . . . had been contractually obligated to cover with insurance but failed to obtain." *Id.* Noting that economic loss and not physical injury was the basis of the general contractor's claims, the court went on to hold that the insurer was not obligated to defend or indemnify the subcontractor in the suit brought by the general contractor. *Id.* at *3, *5.

The court in *Federal Insurance Co. v. New Hampshire Insurance Co.*, No. 03-385-BAJ-M2, 2010 WL 3523050, *1 (M.D. La., July. 30, 2010) reached a similar result. There, an explosion

15

to the subcontractor's failure to obtain the necessary workers' compensation coverage under the subcontract. *Id.* at *2. The subcontractor then made a claim under its commercial general liability policy for defense and indemnification, but the insurer denied coverage on the ground that the general contractor's lawsuit involved only economic claims against the subcontractor. *Id.* The subcontractor filed suit against the commercial liability insurer for breach of the insurer's duty to defend and indemnify it. *Id.* at *2. Similar to this case, the policy at issue stated that the insurer was to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'" and that the insurer would "have the right and duty to defend the insured against any 'suit' seeking those damages." *Id.* at *1. Based on the terms of the policy, the court stated that "[n]one of [the general contractor's] claims against [the subcontractor] . . . were based on bodily injury." *Id.* at *3. Although the employee's "physical injury formed the background for [the general contractor's] lawsuit, [the general contractor] did not sue [the subcontractor] because [the employee] was injured and did not seek damages for [that] injury." *Id.* The court stated that the general contractor brought suit against the subcontractor "because it was forced to pay the workers' compensation benefits [the subcontractor] . . . had been contractually obligated to cover with insurance but failed to obtain." *Id.* Noting that economic loss and not physical injury was the basis of the general contractor's claims, the court went on to hold that the insurer was not obligated to defend or indemnify the subcontractor in the suit brought by the general contractor. *Id.* at *3, *5.

The court in *Federal Insurance Co. v. New Hampshire Insurance Co.*, No. 03-385-BAJ-M2, 2010 WL 3523050, *1 (M.D. La., July. 30, 2010) reached a similar result. There, an explosion

at a chemical plant caused injuries to thousands of individuals. *Id.* at *1. One such individual, named Wayne Robins ("Robins"), commenced a lawsuit against the chemical plant and other defendants. *Id.* That lawsuit was consolidated with a lawsuit brought by property insurers, including an insurer named AXA Global Risks ("AXA"), against a number of defendants, including Thomas & Betts Corporation ("T & B"). *Id.* These property insurers had paid large sums of money to cover the chemical plant's damages and were seeking to recover those sums through subrogation against the at-fault parties. *Id.* Before the consolidation, AXA and Robins entered into an agreement where AXA loaned Robins money to secure his participation as a plaintiff in the lawsuits. *Id.* Another agreement was entered before trial between these parties where AXA loaned additional money to Robins for his continued participation. *Id.* The loan agreement required Robins to repay the sums he received from AXA in addition to a penalty if he settled with either of the defendants, including T & B, without the consent of counsel for AXA. *Id.* Robins ended up settling with T & B, and the terms of the settlement memorandum required T & B and its insurers to defend and indemnify Robins in any suit brought by, among others, AXA. *Id.* at *2. Because Robins failed to obtain the consent of AXA's counsel prior to settling with T & B, AXA demanded that Robins repay the money it loaned to him under their agreement. *Id.* New Hampshire Insurance Company ("New Hampshire"), T & B's general liability carrier, refused to indemnify Robins against AXA's demand for repayment, explaining that it had not agreed to defend or indemnify Robins against AXA's claims pursuant to the settlement memorandum between him and T & B and that T & B's policy did not provide coverage for such sums of money. *Id.* Because of New Hampshire's refusal to indemnify Robins, Federal

16

Insurance Company ("Federal"), T & B's excess carrier, repaid AXA the sums it provided to Robins. *Id.* Federal then brought suit against New Hampshire, seeking to recover the sums it paid to AXA on behalf of Robins. *Id.* at *3.

New Hampshire's policy, which is also similar to Nautilus's policy, provided that it would pay those sums that T & B "becomes legally obligated to pay by reason of liability imposed by law *or* assumed by [T & B] under an Insured Contract *because of Bodily Injury*." *Id.* (alteration in original). New Hampshire argued that it did not agree to repayment of the sums under the settlement agreement since "payment of that sum was not 'because of' and was not the 'direct result of' Robins' bodily injury claims" but was the result of "Robins' breach of the loan agreements/contracts that he had entered into with AXA." *Id.* The court agreed with New Hampshire, holding that the "damages in [the settlement memorandum] [were] economic damages stemming from a breach of contract, rather than bodily injury damages resulting from a tortious act." *Id.* at *4. In reaching this holding, the court stated:

> While it is true that the loan agreements Robins entered into with AXA can be traced to his underlying bodily injury claim against T & B in the sense that he would not have obtained those loans had he not been pursuing litigation against T & B relating to the injuries he sustained during the [chemical] plant explosion, Robins' breach of those loan agreements by settling with T & B without the consent of AXA's counsel is nevertheless a "separate and independent" act, and any claim against him for breach of those loan agreements has its basis in common law relating to contracts, rather than in tort law. T & B's decision and its contractual commitment to assume Robins' liability for that breach of contract claim in the "Memorandum of Agreement" (even if valid consideration for the "Memorandum of Agreement") does not automatically render such contractual claim covered by the CGL policy, which only covers claims "because of 'bodily injury,' 'property damage,'" etc., and which does not provide coverage for contract-based claims.

*Id.* at *6. (footnotes omitted).

As in *Key Custom Homes, Woodcraft Manufacturing, Inc., and Federal Insurance Co.,* though the contract between Afterdisaster and Poole can be traced to the property damage caused by the rain event, Poole's subsequent breach of that contract represents a separate and independent act severing the causal connection with the water intrusion event. Also like in *Federal Insurance Co.*, the events giving rise to Poole's liability to Afterdisaster came after the rain event. *See Fed. Ins. Co.*, 2010 WL 3523050, at *7. Such an indirect connection between Afterdisaster's claims and the rain event is insufficient to trigger Nautilus's duty to defend. To find that Afterdisaster was seeking "damages" because of "property damage" would "distort the meaning of [this] provision and extend its reach so as to provide coverage for any liability where [property damage] is a tangential factor." *Id.* at *4 (quoting *Diamond State Ins. Co. v. Chester-Jensen Co., Inc.*, 611 N.E.2d 1083, 1088 (Ill. Ct. App. 1993)). The Court therefore holds that Westfield has failed to carry its burden of establishing that Nautilus had a duty to defend Poole in the state action,[6] and Nautilus is entitled to judgment as a matter

---

[6] Moreover, not only did Poole's unilateral decision to have the school's interior remediated violate the terms of the policy, (*see* ECF No. 1-2 at 19), and impair Nautilus's ability to protect its interests, which included mounting a litigation strategy to determine fault, *see W. Bend Co. v. Chiaphua Indus., Inc.*, 112 F. Supp. 2d 816, 824 (E.D. Wis. 2000) (explaining that prohibitions against voluntarily assuming obligations "exist to give the insurer—which is being asked to foot the bill—an opportunity to protect its interests"), but the late tender to Nautilus appears to have deprived it of the opportunity to control the defense of Poole in the state action. *See Wm. C. Vick Constr. Co. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569, 596 (E.D.N.C. 1999) (recognizing that an insurer's obligation to pay for pre-notification legal expenses is concomitant with its right to control the defense and that "[a] contrary result would require the insurer to pay for those defense costs which it had no opportunity to control"). To hold, as Westfield urges, that Nautilus should be responsible for attorneys' fees and other legal expenses in defending Poole in an action for breach of an obligation that it was not supposed to undertake according to the policy in the first place, unless at its own expense or with Nautilus's consent, is a result that is plainly at odds with the express language of the policy. *See Woods*, 295 N.C. at 505–06, 246 S.E.2d at 777; *see also Nationwide Mut. Ins. Co. v. Mabe*, 115 N.C. App. 193, 198, 444 S.E.2d 664, 667 (1994) (explaining that the most fundamental rule to interpreting insurance policies is that "the language of the policy controls").

of law on this issue. Accordingly, summary judgment is granted in favor of Nautilus, in part, to the extent that it seeks judgment that it had no duty to defend Poole.

### C. Duty to Indemnify

Although Nautilus's arguments in support of its motion for summary judgment appear to be devoted primarily to the issue of whether it had a duty to defend Poole in the state court proceeding, Nautilus asserts that because there was no duty to defend Poole, and the duty to defend is broader than the duty to indemnify, then there can be no duty to indemnify Poole. (ECF No. 29 at 6.) To the extent that Nautilus believes that it "is entitled to summary judgment on any and all claims brought by Plaintiff Westfield Insurance Company," specifically the duty to indemnify, (ECF No. 21 at 1), the Court disagrees and denies summary judgment on all remaining issues.

It is well established that the duty to defend, though broader than the duty to indemnify, is a distinct duty. *See Erie Ins. Exch.*, 227 N.C. App. at 245, 742 S.E.2d at 810. While the reasons that may negate an insurer's duty to defend may also negate an insurer's duty to indemnify, the duty to defend does not subsume the duty to indemnify, *see Grinnell Mut. Reinsurance Co. v. Reinke*, 43 F.3d 1152, 1154 (7th Cir. 1995) ("A conclusion that the insurer must defend does not imply that it must indemnify; because of the possibility that the legal theory of the underlying suit may change, a conclusion that the insurer need not defend does not imply that it need not indemnify."); *see also Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 592, 602 n.4 (5th Cir. 2011) (applying Texas law and reversing the trial court's holding that insurer had a duty to defend but affirming the trial court's holding that the insurer had a duty to indemnify).

19

While Poole's failure to pay Afterdisaster the $258,437.25 for its services was the catalyst for Afterdisaster's state action against Poole, Westfield, as Poole's assignee, is not foreclosed from potentially being reimbursed by Nautilus for the amount it paid Afterdisaster for its remediation efforts, as the invoice provided by Afterdisaster may be the measure of damages to the physical property of the school. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1056 (C.D. Cal. 2011) (noting that intangible losses are recoverable if they provide a measure of damages to the physical property). If the facts established in this litigation show that the property damage was caused in whole or in part by Associated Steel and the costs to remediate the interior of the school are damages covered under the Nautilus policy, then Nautilus could have a duty to indemnify Westfield, as Poole's assignee, for such damages. The Court therefore denies Nautilus's motion, in part, to the extent it seeks summary judgment that it had no duty to indemnify Westfield, as Poole's assignee.[7]

## V. CONCLUSION

For the reasons outlined herein, the Court finds that Nautilus did not have a duty to defend Poole in the underlying state action; however, genuine issues of material fact remain with respect to whether Nautilus must indemnify Westfield, Poole's assignee. Westfield's

---

[7] Moreover, it is important to note that, had Poole paid the amount claimed on Afterdisaster's invoice, and the claim was covered under the Nautilus policy, then Nautilus would have had to reimburse Poole under North Carolina law unless it could demonstrate prejudice. *See Bond/Tec, Inc., v. Scottsdale Ins. Co.*, 174 N.C. App. 820, 824, 622 S.E.2d 165, 168 (2005). The Court's conclusion that Nautilus may have a duty to indemnify Poole is therefore consistent with an outcome that would ordinarily have followed in the absence of the Afterdisaster lawsuit.

motion is denied, and Nautilus's motion is granted to the extent that it seeks summary judgment regarding its duty to defend.

## ORDER

IT IS THEREFORE ORDERED that Westfield's Motion for Summary Judgment is DENIED (ECF No. 17) and Nautilus's Motion for Summary Judgment (ECF No. 21) is GRANTED to the extent it involves the duty to defend and DENIED to the extent that it seeks summary judgment on the duty to indemnify.

This, the 7th day of January, 2016.


                       _____/s/ Loretta C. Biggs_____
                              United States District Judge